The HUNT CONSTRUCTION GROUP,
INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5061.

United States Court of Appeals,
Federal Circuit.

March 1, 2002.

1370

Joseph J. Brigati, Kirkpatrick & Lockhart LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Lance W. High.

Thomas D. Dinackus, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Bryant G. Snee, Assistant Director.

Before BRYSON, LINN, and DYK, Circuit Judges.

## DECISION

DYK, Circuit Judge.

The Hunt Construction Group, Inc. ("Hunt") appeals the decision of the United States Court of Federal Claims granting summary judgment that the United States is not liable to pay state and local sales and use taxes under a contract between Hunt and the Department of Veterans Affairs ("DVA"). *Hunt Constr. Group, Inc. v. United States*, 48 Fed. Cl. 456 (2001). Because the contract unambiguously required Hunt to pay state and local sales and use taxes, and did not require the United States to execute an agency agreement, we affirm.

## BACKGROUND

In May 1996, DVA issued a Solicitation for Proposals (the "Solicitation") for construction of a hospital in Arizona. Two provisions concerning state and local taxes were contained in the Solicitation: Federal Acquisition Regulation ("FAR") § 52.229–3, 48 C.F.R. § 52.229–3 (1996), and a "Special Notice." Section 52.229–3[1] states in pertinent part that "[t]he contract price includes all applicable Federal, State, and local taxes and duties." FAR § 52.229–3(b) (1996). The Special Notice, appearing on a sheet of green paper immediately following the table of contents, provided that "sales and use tax exemptions should be sought where applicable."

The parties agree that the only potentially applicable exemption from state taxes under Arizona law relates to purchases of permanent materials by "qualifying hospitals" or their agents. To be eligible for this exemption under Arizona law, a contractor like Hunt must be designated as the "purchasing agent" of the relevant government agency. On that point, section 29.303(a) of the FAR provides that: "Prime contractors and subcontractors shall not normally be designated as agents of the Government for the purpose of claiming immunity from State or local sales and use taxes." FAR § 29.303(a) (1996). The government disfavors such agency agreements because they alter the nature of the relationship and duties between the government and the contractor, and may require additional government resources to administer the contract.

Hunt submitted a bid on June 27, 1996. Hunt did not communicate to DVA that it excluded from its bid state and local sales and use taxes for permanent materials. Hunt excluded those taxes because, according to Hunt, it assumed that DVA would designate the successful bidder as its agent in order to secure the tax exemption. Hunt did not consult counsel before submitting its bid, nor did it take FAR § 29.303(a) into account when formulating its bid. DVA awarded the contract to Hunt on August 27, 1996. The final contract included both FAR § 52.229–3 and the Special Notice.

Hunt immediately began construction. On January 10, 1997, Hunt requested that the Contracting Officer sign an agency agreement designating Hunt as its purchasing agent. The Contracting Officer ultimately declined to do so, explaining that Hunt's request was "not in the interest of the Government." Without an agency agreement, Hunt was ineligible for the tax exemption. Hunt then submitted a claim to the Contracting Officer for reimbursement of the sales and use taxes it

---

1. A related section, section 52.229–3(h), provides: "The Government shall, without liability, furnish evidence appropriate to establish exemption from any Federal, State, or local tax when the Contractor requests such evidence and a reasonable basis exists to sustain the exemption." FAR § 52.229–3(h) (1996). This does not obligate the government to execute agency agreements, but merely provides that the government will perform the simple ministerial task of providing documentation that already exists.

paid. The Contracting Officer denied Hunt's claim on June 30, 1998, relying on FAR § 29.303(a).

Hunt brought suit in the Court of Federal Claims seeking $672,000, representing the amount it paid for sales and use taxes that it did not include in its bid, plus interest. The Court of Federal Claims denied Hunt's motion for summary judgment and granted the government's cross-motion for summary judgment, finding that the contract unambiguously required Hunt to pay sales and use taxes and did not obligate the government to designate Hunt as its agent. *Hunt Constr. Group,* 48 Fed. Cl. at 460. Specifically, the Court of Federal Claims found, *inter alia,* that FAR § 52.229-3, taken together with the Special Notice, was unambiguous. *Id.*

This timely appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I

■ The primary issue on appeal is whether the Court of Federal Claims correctly interpreted the provisions of the contract as unambiguously requiring Hunt to pay state and local taxes, and as not requiring the government to designate Hunt as its agent. This question of contract interpretation is one of law, and we review the Court of Federal Claims' interpretation without deference. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1479 (Fed.Cir.1997).

### II

■ "We begin with the plain language" when interpreting a contract. *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir.1996). "A contract is ambiguous only when it is susceptible to two reasonable interpretations." *A–Transport Northwest Co., Inc. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994).

The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts. *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir. 1991).

■ Hunt contends that it is entitled to reimbursement from the government for the state and local sales and use taxes it paid on permanent construction materials, because, even if FAR § 52.229-3 is unambiguous on its face, the Special Notice introduced ambiguity into the contract. Hunt claims to have interpreted FAR § 52.229-3 together with the Special Notice as "indicating an intent by DVA to take advantage of the available sales and use tax exemptions by designating [the successful bidder] as purchasing agent. . . ." The government urges us to look no further than the plain language of the contract to find that Hunt was unambiguously required to pay those taxes.

■ The tax exemption provisions of the contract are unambiguous and do not support Hunt's interpretation. FAR § 52.229-3 plainly instructed bidders that "[t]he contract price includes all applicable Federal, State, and local taxes and duties." FAR § 52.229-3 (1996). The Special Notice did not introduce ambiguity. It simply notified bidders that "[s]ales and use tax exemptions should be sought where applicable." The Special Notice did not state that DVA intended to designate the successful bidder as its agent to secure certain tax exemptions. Nothing in the Special Notice contradicts the clear language of FAR § 52.229-3. The existence of section 29.303(a), providing that the government shall not normally designate contractors as its agents, makes it particularly inappropriate to interpret the Special Notice as imposing an obligation on the government to execute an agency agreement. Although Hunt claims to have been un-

■

aware of section 29.303(a) when it prepared its bid, and this section apparently was not included in the contract, it is not unfair to charge Hunt with constructive notice of pertinent regulations published in the Federal Register. *Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents."); *see* 44 U.S.C. § 1507 (1994).

■ In sum, we agree with the Court of Federal Claims that the Special Notice "merely put offerors on notice that exemptions might be available and that the offerors themselves remain[ed] responsible for taking actions necessary to obtain those exemptions." *Hunt Constr. Group,* 48 Fed. Cl. at 460. When the contract language is unambiguous on its face, our inquiry ends, and the plain language of the contract controls. *See Textron Def. Sys. v. Widnall,* 143 F.3d 1465, 1469 (Fed.Cir. 1998).

### III

■ Hunt argues, however, that the language of FAR § 52.229–3 together with the Special Notice, even if unambiguous on its face, must be considered in light of the "particular circumstances" surrounding the procurement. Specifically, Hunt argues that we should consider evidence of local trade practice before determining whether the contract is ambiguous. To that end, Hunt argues that Arizona public authorities routinely appoint contractors as their agents to secure tax exemptions. Hunt could not below, and cannot now, identify a single instance where a federal agency had executed such an agency agreement with a construction contractor. Rather, Hunt only pointed to instances where state and local agencies have executed such agreements.

■ Hunt relies on *Metric Constructors, Inc. v. National Aeronautics & Space Administration,* 169 F.3d 747, 752 (Fed. Cir.1999), in arguing that the existence of trade practice can render a contract ambiguous that is otherwise clear on its face. *Metric* stands for no such proposition, and Hunt's reliance on *Metric* is misplaced. Hunt surprisingly fails to discuss our later decision in *Jowett, Inc. v. United States,* 234 F.3d 1365 (Fed.Cir.2000), which distinguished *Metric.* In *Jowett,* we recognized that evidence of trade practice may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning—even where the contract otherwise appears unambiguous—because "the parties to a contract ... can be their own lexicographers and ... trade practice may serve that lexicographic function in some cases." *Id.* at 1368. Consideration of trade practice may be a useful interpretation aid where "there is [a] term in the contract that has an accepted industry meaning different from its ordinary meaning" or where there is a "term with an accepted industry meaning that was omitted from the contract." *Id.* at 1369. But Hunt does not claim that there is such a term of art included or omitted here. Trade practice is therefore irrelevant in this case, and the contract's unambiguous terms govern.

### IV

Hunt also argues that McCarthy Brothers Company ("McCarthy"), another bidder, interpreted the contract "just as Hunt did," that McCarthy was advised by the contracting officer that its interpretation was incorrect, and that the contracting officer should have notified Hunt of McCarthy's interpretation and of. the government's response.

McCarthy submitted a bid on the same day as Hunt. But unlike Hunt, McCarthy communicated directly to the contracting officer that it did not include the state and local sales and use taxes in its bid. McCarthy's bid contained the following qualification:

In accordance with the special notice contained in the RFP submittal package dated May 21, 1996, McCarthy has sought out appropriate sales and use tax exemptions for this project.

We have not included any such tax for the permanent materials purchase [sic] by McCarthy as agent for the VA's account.

To obtain this benefit, the VA must sign an Agency Agreement similar to the attached form in accordance with A.A.C.R. 15–5–629.B. simultaneous with signing the contract. McCarthy has utilized the arrangement successfully on several projects.

The contracting officer responded to McCarthy's qualified bid:

Your offer on Item 17 states, "see the attached Qualifications." I consider the qualifications not in compliance with Federal Acquisition Regulation (FAR) 14.404–2(d)(6)—limiting the rights of the Government. You are requested to remove your qualifications.

McCarthy then submitted its best and final offer, with the following explanation:

6. We remove our qualification on Item 17.

7. Our original price for this work was $27,198,000. We now make a final and best offer as follows of $26,695,000 on the same basis as our original proposal (without sales tax on permanent materials) which can be further amended by you if you select any of the following alternates.

 1. Add $496,000 if the VA is unwilling to sign the Arizona Revenue Department Hospital Agency Agreement concurrent with the contract so as to take advantage of the sales tax exemption on permanent materials.

The contracting officer added $496,000 to McCarthy's offer in the course of evaluating the bidders' prices.

McCarthy's qualification of its bid gives rise to two possible arguments: (1) under FAR § 14.208(c), information regarding the government's response to McCarthy's bid was "necessary for bidders to submit bids," and the government accordingly had an obligation to notify all bidders of McCarthy's interpretation and of the government's response; and (2) McCarthy's qualified bid created a duty on the government to verify all bids to ensure that they did not contain the same erroneous contract interpretation.

A. Duty to notify

 Section 14.208(c) of the FAR provides:

(c) *Any information* given to a prospective bidder concerning an invitation for bids *shall be furnished promptly* to all other prospective bidders as an amendment to the invitation (1) *if such information is necessary for bidders to submit bids* or (2) *if the lack of such information would be prejudicial to uninformed bidders.* The information shall be furnished even though a prebid conference is held. No award shall be made on the invitation unless such amendment has been issued in sufficient time to permit all prospective bidders to consider such information in submitting or modifying their bids.

FAR § 14.208(c) (1996) (emphases added).

 We have not previously interpreted section 14.208(c), but the Board of Contract Appeals has interpreted the regulation that preceded section 14.208(c), which

was codified in Armed Services Procurement Regulations ("ASPR") § 2–208(c) (1974). In *Peter Kiewit and Sons, Inc.,* ASBCA No. 17,709, 74–2 BCA ¶ 10,975 (1974), the Board found that a government contract for lighting systems contained a patent ambiguity. The Board recognized the well-established rule that a contractor has a duty to seek clarification of a patent ambiguity. *Id. See Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 998 (Fed.Cir. 1996).[2] But because another bidder asked for clarification of the ambiguity prior to bid award, the Board held that the government had notice of the patent ambiguity and therefore was obligated under ASPR § 2–208(c) to advise all other bidders of the ambiguity in the contract. The Board held that "[t]he information given to this one prospective bidder should have been disseminated to all bidders." The Board excused the contractor's failure to inquire about the patent ambiguity, because the other bidder's inquiry gave the government notice of the ambiguity, thereby obligating the government to clarify that ambiguity to all bidders.

Similarly, in *Price/CIRI Construction, J.V.,* ASBCA No. 37,002, 89–3 BCA ¶ 22,-059 (1989), the Board relied on ASPR 2–208(c) to find that the government had a duty to clarify a patent ambiguity to all bidders, where one prospective bidder notified the government of the patent ambiguity prior to bid award:

> The Government created an ambiguity for which it was responsible, but the appellant failed in its duty to inquire. The ambiguity was, however, called to the attention of the Government prior to the bid opening. This placed upon it a duty to clarify the ambiguity, which it failed to do. In these circumstances the

onus of the original ambiguity still rests upon the Government.

Thus, in both *Peter Kiewit* and *Price/CIRI,* the Board found that the government had a duty to clarify a patent ambiguity of which it had notice prior to bid award.

Hunt relies on *Peter Kiewit* and *Price/CIRI* to argue that DVA was on notice of an ambiguity in the Solicitation, and therefore had a duty to notify Hunt and the other bidders about McCarthy's bid. The government argues that these two cases are "inapposite" because they addressed procurements where the solicitation was found to be ambiguous, and no ambiguity exists here.

■ We agree and hold that such a duty to notify arises only if the contract is ambiguous. On its face the clause requires the government to furnish information to other bidders "(1) if such information is necessary for bidders to submit bids or (2) if the lack of such information would be prejudicial to uninformed bidders." FAR § 14.208(c) (1996). Information can be "necessary" or its absence "prejudicial" only if the information would be material. In other words, the absence of such information cannot be "prejudicial" if its absence is harmless. *Cf. Weinar v. Rollform Inc.,* 744 F.2d 797, 808 (Fed.Cir.1984) (defining "prejudicial" error in context of jury instruction as one that is "not 'harmless' "). Thus, if a contract is unambiguous on its face, the interpretations given to the contract by other bidders are not material, and are not required to be disclosed under section 14.208(c).

As we have determined, the contract here is unambiguous. A mistaken con-

---

2. Where the ambiguity is latent, however, the court will construe the ambiguous term against the government as drafter of the contract, provided that the contractor's interpre-

tation is reasonable and the contractor relied on that interpretation when preparing its bid. *P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1355–56 (Fed.Cir.2002).

struction by one bidder cannot create an ambiguity. It follows that DVA had no obligation to notify Hunt and the other bidders of McCarthy's bid. Accordingly, we need not reach the question of whether the communications between DVA and McCarthy would otherwise be within the scope of the FAR provision.

B. Duty to verify

■ We finally address whether McCarthy's qualified bid gave rise to a duty of the government to verify that no other bids contained the same mistaken interpretation. We conclude the government had no such duty.

■ When the government has notice of a mistake in a particular bid, the government may have a duty to verify that bid by calling attention to the specific error suspected. *Giesler v. United States*, 232 F.3d 864, 869 (Fed.Cir.2000); *Ruggiero v. United States*, 190 Ct.Cl. 327, 420 F.2d 709, 716 (1970); *see also* FAR § 14.407–1 (1996). This doctrine promotes fairness and good faith dealing by preventing the government from knowingly awarding a contract to a bidder whose bid contained a mistake of which the government was aware. But, even if this doctrine were applicable here,[3] the government, when confronted with one bidder's unreasonable interpretation of the contract, does not have an obligation to verify *other* bids to ensure that no other bids incorporated the same unreasonable contract interpretation. We are not aware of any binding authority obligating the government to verify all bids, where another bidder made a mistake in interpreting the provisions of an unambiguous contract. We decline to so hold, and we specifically disapprove of *BCM Corp. v. United States*, 2 Cl.Ct. 602,

609–10 (1983), to the extent that it appears to hold the contrary.

■ In sum, where a contract is unambiguous, the government has no duty to notify bidders about a contrary interpretation by one of the bidders, or to verify the other bids.

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims is affirmed.

## COSTS

No costs.

*AFFIRMED.*

---

3. This duty arises only where the contractor's mistake is a "clear cut clerical or arithmetical error, or a misreading of the specifications." *Giesler*, 232 F.3d at 869 (quoting *Liebherr*

*Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed.Cir.1987)); *see also Ruggiero*, 420 F.2d at 713.